## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

EICHER MOTORS LIMITED,

                  Plaintiff,

          v.

THE PARTNERSHIPS AND
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A",

                Defendants.

No. 25-cv-02937

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

This case involves claims of trademark infringement against a group of online foreign-merchant Defendants who, Plaintiff asserts, are acting in coordinated fashion to pillage Plaintiff's intellectual property rights. It is but one of thousands of similar trademark, copyright, and patent infringement actions that, since the early 2010s, have proceeded under the so-called "Schedule A" model that originated and remains paramount in the Northern District of Illinois. Called "Schedule A" because of the practice of listing the dozens (often hundreds) of defendants in a document attached to the complaint as "Schedule A," the model involves a brand owner suing multiple joined defendants for trademark, copyright, or patent infringement.

A typical Schedule A case follows a well-worn path: the plaintiff files a complaint, generally under seal and often under a pseudonym. Along with the complaint, the plaintiff also files motions to restrain the defendants' assets held in

online marketplace accounts (most defendants are foreign storefronts doing business on popular e-commerce platforms such as Amazon, Etsy, and Walmart) and to enter a temporary restraining order barring further infringement. But these requests are typically not litigated in adversarial fashion, as plaintiffs almost always seek and obtain leave to proceed under seal and ex parte. By the time any defendant appears in the case, it is most often after the defendant's account has been frozen and its funds restricted. Schedule A cases almost exclusively get resolved after the entry of a preliminary injunction, dismissal of some defendants, settlements with others, and a default judgment against the remainder.

This inventive scheme had its origins in a genuine and well-documented problem: domestic IP rightsholders' contention with the threat of foreign competitors, often located in the People's Republic of China,[1] misappropriating their IP in sales through online marketplaces. That brand owners would seek to curb costly and damaging infringement through innovative means is both understandable and predictable.

Many judges in the Northern District of Illinois have accepted the Schedule A mechanism as a well-established method of redress for IP rightsholders. But as legal scholars and judges have increasingly recognized, in part due to the deluge of

---

[1] *See* Lei Zhu, *Made in China, Sued in the U.S.: The Exploitation of Civil Procedure in Cross-Border E-Commerce Trademark Infringement Cases*, 34 Duke J. Comp. & Int'l L. 139, 140 (2023) ("It is estimated that the Chinese cross-border e-commerce industry reached a market size of more than $3.5 trillion in 2020. However, many do not know that these Chinese sellers are being targeted by a wave of trademark infringement lawsuits in U.S. federal courts . . . that began in the early 2010's, with the Northern District of Illinois being the most-favored forum to file such suits.").

Schedule A cases filed in only a small number of judicial districts, the Schedule A mechanism works only by stretching applicable procedural rules past their breaking point.

Having imposed an across-the-board stay in all newly-filed Schedule A cases on its docket, this Court has taken a fresh and close look at the propriety of the Schedule A mechanism. That review has not been flattering: as explained below, the routine granting of preliminary injunctive relief in the absence of adversarial proceedings; the widespread sealing of judicial documents from public scrutiny; the pell-mell prejudgment freezing of defendants' assets to ensure the practical availability of a legal remedy; and the mass joinder of multiple defendants is unjustified under the procedural rules and should not continue. Although the scourge of intellectual property theft and abuse is real, persistent, and highly damaging, the remedy for that problem must be sought by other means. Accordingly, Plaintiff's motion for a temporary restraining order is denied.

## I.    BACKGROUND

### A.    The "Schedule A" Phenomenon

Combatting pernicious infringement of the intellectual property rights of individuals and entities has been a goal of brand owners and others for many years, but the effectiveness of those efforts has been blunted by the ubiquitous availability of online suppliers and their confederates in the supply chain—many of whom are based overseas. As here, plaintiffs in Schedule A cases often cite in affidavits and include as exhibits literature on the problem of foreign counterfeiting. (*See, e.g.,* Dkt. 12-3 ¶ 3 ("According to an intellectual property rights seizures statistics reports

issued by Homeland Security, the manufacturer's suggested retail price (MSRP) of goods seized by the U.S. government in 2024 was $5.4 billion. 32.3 million products were seized in 2024, up from 23 million in 2023. From fiscal year 2020 to fiscal year 2024, the total number of goods seized has increased 311% and the MSRP of seized goods has increased 415%."); Dkt. 12-5 at 4 ("China and Hong Kong are consistently the top two countries for IPR seizures. In FY 2024, seizures from China and Hong Kong accounted for approximately 90% of the total quantity seized.").)

Starting well over a decade ago (the provenance is not clear), some plaintiffs and their counsel created a mechanism by which IP owners can hit infringers where it hurts: in the pocketbook. As argued by experienced and able plaintiffs' counsel in another case, the "Schedule A" mechanism has been effective in blunting the harm wrought by the wholesale pillaging of legitimate IP rights by primarily overseas actors. *See Collegiate Licensing Co., LLC v. Schedule "A,"* No. 24-cv-06219 (N.D. Ill. Sept. 27, 2024), Dkt. 23 at 8 ("Schedule A cases are one of the few effective mechanisms for brand owners to combat the onslaught of online infringement from offshore bad actors (located primarily in China and Vietnam). Schedule A cases are extremely effective at deterring infringers because there are real consequences for infringement. Specifically, the [prejudgment] asset restraint ensures that infringers are required to turn over ill-gotten profits.").

Schedule A litigation commences when a plaintiff files a single case with a voluminous list of defendants attached as a separate document (the so-called "Schedule A" to the complaint). In the paradigmatic case, the Schedule A plaintiff

uses this maneuver to assert IP rights against a mass of anonymous and (most often) foreign defendants, who operate stores on popular e-commerce sites and allegedly sell infringing or counterfeit products. Schedule A complaints ordinarily are drafted at a high level of generality (bordering on boilerplate) and lack specifics as to each defendant or how the defendants relate to one another. Schedule A cases are also typically brought on an ex parte basis and are accompanied by (1) a motion seeking an emergency TRO against the allegedly infringing behavior; (2) a request for a prejudgment asset restraint; (3) a motion to keep a portion, or even all, of the proceedings sealed; and (4) a motion for electronic service of process. *See, e.g.*, Eric Goldman, *A Sad Scheme of Abusive Intellectual Property Litigation*, 123 Colum. L. Rev. F. 183, 186–93 (2023) (case study of typical Schedule A case); Sarah Frackrell, *The Counterfeit Sham*, 138 Harv. L. Rev. 471, 493–95 (2024). The prevalence of Schedule A cases, and the pro forma manner by which they are filed, has spurred commentary from the academy, the judiciary, and beyond.[2]

Judges in this District have routinely granted plaintiffs' initial requests in Schedule A cases. But as time has passed, and as Schedule A cases have inundated

---

[2] Because the topic has been covered extensively elsewhere, this opinion will not tarry over a lengthy explanation of the development of Schedule A cases and how the mechanism has worked. *See, e.g.*, *Sad Scheme* at 186–93; *The Counterfeit Sham* at 493–95; *Zorro Prods., Inc. v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Associations Identified on Schedule A Hereto*, No. 23-CV-5761, 2023 WL 8807254 (N.D. Ill. Dec. 20, 2023); Bianca E. Ciarroni & Marcus S. Harris, *Understanding Schedule A Trademark Litigation - A Step-by-Step Guide*, Taft Stettinius & Hollister LLP (Feb. 20, 2025), https://www.taftlaw.com/news-events/law-bulletins/understanding-schedule-a-trademark-litigation-a-step-by-step-guide/.

judges' dockets in this District,[3] the validity of the present approach has become less convincing. Schedule A defendants now regularly appear to contest, among other issues, jurisdiction, joinder, and the plaintiff's entitlement to an asset restraint, often with success. The subject matter of Schedule A litigation has also grown to encompass complex IP disputes, including design and even utility patent infringement. This complexity renders the sound adjudication of the TRO request all but impossible in the absence of adversarial briefing. Schedule A plaintiffs routinely ask judges in this District to decide issues that are not properly amenable to resolution on an ex parte, emergency basis (which of course should be a rare occurrence). That lack of an adversarial presentation at the critical early stage of these cases has forced this Court to reassess, on its own initiative, the standard approach to Schedule A cases.[4]

---

[3] Although the reasons why are unclear, the Northern District of Illinois started out as and remains the epicenter of Schedule A litigation. *See Sad Scheme* at 194–96. Even a cursory review of public dockets using the methodology described by Professor Goldman, *see id.*, confirms that this District continues to be the overwhelmingly preferred forum by Schedule A plaintiffs, with hundreds or thousands of such cases pending (nearly three quarters of which involve allegations of trademark infringement).

[4] It appears that no Seventh Circuit decision has comprehensively addressed whether the Schedule A mechanism comports with the Federal Rules of Civil Procedure or general principles of procedural due process. Other judges in this District, however, have increasingly voiced concerns or asked for additional briefing on aspects of the Schedule A approach. *See, e.g., Zorro*, 2023 WL 8807254 (Seeger, J.); *Estee Lauder Cosms. Ltd. v. Partnerships & Unincorporated Associations Identified on Schedule A*, 334 F.R.D. 182 (N.D. Ill. 2020) (Chang, J.); *Roadget Bus. Pte. Ltd. v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Associations Identified on Schedule A Hereto*, No. 24-cv-00607, 2024 WL 5438707 (N.D. Ill. Feb. 13, 2024) (Jenkins, J.); *Mercis, B.V. v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Associations Identified on Schedule A Hereto*, No. 24-cv-03780, 2024 WL 5440025 (N.D. Ill. Nov. 18, 2024) (Alonso, J.); *Bailie v. Partnerships & Unincorporated Associations Identified on Schedule A*, 734 F. Supp. 3d 798 (N.D. Ill. 2024) (Gottschall, J.); *Zaful (Hong Kong) Ltd. v. Individuals, Corps., Ltd. Liab. Companies, Partnerships, & Unincorporated Associations Identified on Schedule A*, No. 24-cv-11111, 2025 WL 71797 (N.D. Ill. Jan. 10, 2025) (Perry, J.); *Viking Arm AS v. Partnerships & Unincorporated Associations Identified on Schedule A*, No. 24-cv-01566, 2024 WL 2953105 (N.D. Ill. June 6, 2024) (Hunt, J.).

## B.    Procedural History

In this case, Plaintiff Eicher Motors Limited alleges that Defendants have committed federal trademark infringement and counterfeiting, common law trademark infringement, false designation of origin, and a violation of the Illinois Uniform Deceptive Trade Practices Act. (Dkt. 1 ¶¶ 24–50; Dkt. 12 at 14–22.) Specifically, Plaintiff, a motorcycle brand, alleges that fifty Defendants (listed on a provisionally sealed Schedule A) are selling products bearing counterfeit versions of Plaintiff's ROYAL ENFIELD trademarks through online marketplaces such as Aliexpress and Alipay. (Dkt. 1 ¶¶ 3–23; Dkt 8.)

Upon filing the complaint, Plaintiff moved for an ex parte TRO, temporary asset restraint, expedited discovery, and service of process by email or electronic publication. (Dkt. 11.) To justify those requests, Plaintiff states that, "[i]n light of the covert nature of offshore counterfeiting activities and the vital need to establish an economic disincentive for trademark infringement, courts regularly issue such orders." (Dkt. 12 at 11.) More specifically, Plaintiff justifies joining fifty Defendants to this action because "there are numerous similarities among the Defendants' Internet Stores" in their design, and "upon information and belief," they are interrelated. (*Id.* at 16.)

Plaintiff also asserts that, as a general proposition, "counterfeiters like Defendants will often register new online marketplace accounts under new aliases once they receive notice of a lawsuit." (*Id.* at 17.) In "the absence of a temporary

restraining order without notice," Plaintiff states, "Defendants can and likely will modify registration data and content, change hosts, redirect traffic to other websites in their control, and move any assets from U.S.-based bank accounts, including Aliexpress and Alipay accounts." (*Id.* at 19.) According to Plaintiff, the need for ex parte relief is therefore "magnified in today's global economy where counterfeiters can operate over the Internet in an anonymous fashion." (*Id.* at 35.) Ex parte relief is also justified because Plaintiff is unaware of the identities and locations of Defendants and because "[m]any courts have authorized immediate injunctive relief in similar cases involving the unauthorized use of trademarks and counterfeiting." (*Id.* (citing cases).)

## II.    STANDARD OF REVIEW

It has been long established that a TRO is "an extraordinary and drastic remedy," *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005), and may only be issued without notice to the opposing party or its attorney if "specific facts in an affidavit or a verified complaint *clearly* show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A) (emphasis added). Preliminary injunctive relief "require[s] a clear showing that the movant is entitled to it." *Xped LLC v. Entities Listed on Ex. 1*, 690 F. Supp. 3d 831, 853 (N.D. Ill. 2023). To obtain a TRO, a plaintiff must satisfy the required injunction factors and demonstrate: (1) a likelihood of success on the merits; (2) that it has no adequate remedy at law; and (3) that it will suffer irreparable harm if the relief is not granted. *See, e.g.*, *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). If each of those

factors is met, the Court, employing a sliding scale approach, first weighs the harm the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction; it next considers whether an injunction is in the public interest. *See id.*

## III. DISCUSSION

### A. The Requested Relief is Unwarranted

#### 1. *Ex Parte Proceedings Ought to be Reserved for Extraordinary Circumstances Not Typically Present in Schedule A Cases*

Plaintiffs in Schedule A cases typically seek, as Plaintiff does here, an emergency TRO on an ex parte basis. But a TRO is itself an "extraordinary and drastic remedy," made even more so when it is sought without providing notice to the other side. *Goodman*, 430 F.3d at 437. That is why Rule 65(b) of the Federal Rules of Civil Procedure heightens the burden on plaintiffs seeking ex parte injunctive relief to aver specific facts justifying a departure from the general rule in favor of adversarial proceedings and public access to the courts. *See, e.g., Granny Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974) ("[O]ur entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute."); *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 321 (7th Cir. 1984) (district court may not "disregard[] the strict procedural requirements of Fed. R. Civ. P. 65(b) for the issuance of such ex parte orders" because, even though Rule 65(b) expressly contemplates their issuance, "the circumstances in which an ex parte order should be granted are extremely limited."). Indeed, under Rule 65(b), a court may issue a TRO without written or oral notice to the adverse party or its attorney only if:

(A) **specific facts** in an affidavit or a verified complaint **clearly show that immediate and irreparable injury, loss, or damage will result** to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1) (emphasis added). These are not trivial requirements.

Start with the requirement of specific facts. Without the benefit of adversarial briefing, the Court "has no choice but to rely on the plaintiff's truthfulness." *Xped*, 690 F. Supp. 3d at 859. It is therefore essential that facts be stated specifically and under penalty of perjury. Accordingly, an ex parte TRO should be granted only under "extremely limited" circumstances and with "stringent restrictions." *Am. Can.*, 742 F.2d at 321. Ex parte TROs should be "restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose*, 415 U.S. at 439. They "are most familiar to courts where notice to the adversary party is impossible either because the identity of the adverse party is unknown or because a known party cannot be located in time for a hearing." *Am. Can*, 742 F.2d at 314; *see also Am. Girl, LLC v. Nameview, Inc.*, 381 F. Supp. 2d 876, 880 (E.D. Wis. 2005) ("There is also 'a very narrow band of cases in which ex parte orders are proper because notice to the defendant would render fruitless the further prosecution of the action.' ") (citing *Am. Can.*, 742 F.2d at 322).

Schedule A cases rarely, if ever, meet this requirement. This Court has not encountered a Schedule A case (the present case is no exception) in which the Schedule A plaintiff provided specific facts showing that *each Defendant* will cause

10

irreparable injury absent an injunction. As others have noted, and as has been confirmed by the Court's experience, Schedule A complaints are typically drafted at a high level of generality and allege that defendants' infringement, *en masse*, threatens irreparable harm in the absence of a TRO. *See, e.g., Sad Scheme* at 187 ("The complaint will generically contain sparse factual assertions that are not particularized to any defendant, which makes it easy to clone-and-revise the complaint for subsequent cases."); *Zorro*, 2023 WL 8807254, at *2 ("By and large, the Schedule A bar uses the same template in each case, treating the filings like a factory mold. They change a few names, tinker here and there, and then kick out a new complaint for a new client.").

That approach is, on its face, incompatible with Rule 65(b)'s specificity requirement. Of course, ex parte emergency relief has its place: to maintain the status quo if proceeding without the other party is absolutely necessary; if notice to the defendant would render the action fruitless (a point addressed below); or if it is impossible to locate defendants, among other extraordinary considerations. But Schedule A cases do not meet the exigencies, particularly given their now-routine nature.

Schedule A plaintiffs attempt to justify their requests for ex parte TRO relief by suggesting that defendants' alleged counterfeiting is inherently "deceitful and secretive," such that foreign Schedule A defendants are likely to dispose of assets or evidence and are thus primed to violate court orders if they knew they were subject to suit. *See, e.g.*, *Collegiate Licensing Co., LLC v. Schedule "A"*, No. 24-cv-06219 (N.D.

Ill. Sept. 27, 2024), Dkt. 23 at 2–5. But that approach cannot be squared with Rule 65(b)'s specificity requirement, because it asks courts to assume what plaintiffs are required to allege as to each defendant. In effect, Schedule A asks the Court to put the ex parte cart before the horse: presume that defendants will act nefariously unless shown otherwise. That gets Rule 65(b) backward. Our system defaults to the principles of transparency and notice, and *plaintiffs* must justify the extraordinary departure from that rule with specifics.

To be sure, it might be possible for a plaintiff to show, with specific facts, that it was highly probable that a particular infringer would dispose of infringing goods in the hours before the TRO hearing could be held. *See, e.g., Badger Daylighting Corp. v. Rutherford*, No. 1:24-CV-00912-TWP-TAB, 2024 WL 3318251, at *4 (S.D. Ind. June 3, 2024) (citing *In the Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979)). Other plaintiffs (such as the plaintiff in *Vuitton*) have successfully shown that defendants' actions rendered it impossible to seize allegedly infringing, tangible goods so that a court could properly adjudicate the matter. In such instances, it makes sense to allow an ex parte proceeding to preclude the irreparable harm of allowing specific infringing goods to reach the marketplace.[5]

---

[5] In trademark cases, the Lanham Act "expressly allows ex parte seizures" in cases involving allegations relating to tangible counterfeit goods. *Lorillard Tobacco Co. v. Canstar (U.S.A.) Inc.*, No. 03-cv-04769, 2005 WL 3605256, at *1 (N.D. Ill. Aug. 24, 2005); *see* 15 U.S.C. § 1116(d)(1)(A) ("In the case of a civil action . . . with respect to a violation that consists of using a counterfeit mark . . . the court may, upon ex parte application, grant an order . . . providing for the seizure of goods and counterfeit marks involved in such violation . . . .") Perhaps reflecting the extraordinary nature of ex parte proceedings, the Lanham Act requires a number of procedural safeguards, including notification to the United States attorney for the judicial district in which an order is sought, so that the United States has the opportunity to participate, *id.* § 1116(d)(2); an affidavit or verified complaint, *id.*

But that situation is a far cry from the typical Schedule A case. Make no mistake: the *sine qua non* is the seizure of defendants' monetary assets (not specific infringing goods) at the beginning of the case, before even a single defendant has appeared. Schedule A plaintiffs are candid about that goal and praise its effectiveness in deterring infringement. *See*, *e.g.*, *Collegiate Licensing,* No. 24-cv-06219, Dkt. 23 at 8 ("Schedule A cases are extremely effective at deterring infringers because there are real consequences for infringement. Specifically, the asset restraint ensures that infringers are required to turn over ill-gotten profits."). But it is unlikely that what plaintiffs seek to achieve through preliminary injunctive relief amounts to the kind of immediate and irreparable injury, loss, or damage contemplated by Rule 65(b). By and large, the predominate relief sought in Schedule A cases is an award of statutory money damages; and it is plaintiffs' belief that Schedule A defendants will spirit away their funds to unreachable places that drives the request to proceed ex parte. A damages award, however, is a form of legal remedy incompatible with Rule 65(b)'s equitable nature. Given that any irreparable harm wrought by infringement[6] can, as

---

§ 1116(d)(3); adequate security for wrongful seizure, § 1116(d)(4)(A), a requirement that the Court find specific facts, *id.* § 1116(d)(4)(B), and that the materials seized be taken into the custody of the Court, *id.* § 1116(d)(7), among other protections. That this provision of the Lanham Act—upon which Plaintiff does not rely—provides an explicit procedure for ex parte proceedings and specifies the remedy (seizure of goods, not monetary assets) further undercuts the Schedule A formula's reliance on the more generalized ex parte process of Rule 65(b).

[6] Irreparable harm is "especially likely in a trademark case because of the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion (and the interval between the filing of a trademark infringement complaint and final judgment is sure not to be trivial)." *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013); *but see Holbrook Mfg. LLC v. Rhyno Mfg. Inc.*, 497 F. Supp. 3d 319, 333 (N.D. Ill. 2020) (calling into question the presumption of irreparable harm) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)).

with more traditional forms of IP litigation, be addressed through preliminary injunctive relief following an adversarial proceeding, the use of Rule 65(b) to ensure an unimpeded path to a prejudgment asset restraint is unsound.

Rule 65(b) also has a second, occasionally overlooked requirement: certification. Rule 65(b) requires that "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed R. Civ. P. 65(b)(1)(B). Failure to satisfy this prong alone necessitates denial of an ex parte TRO request. *See, e.g., Stoller v. Altisource Residential L.P.*, No. 18-CV-7169, 2019 WL 13328428, at *1 (N.D. Ill. Mar. 14, 2019) ("Here, [plaintiffs] have not adequately certified in writing their efforts to give notice to opposing counsel. This, in itself, warrants denial of their motion under Federal Rule of Civil Procedure 65(b)."); *Dant Clayton Corp. v. Slocum*, No. 4:24-CV-00095, 2024 WL 3730942, at *3 (S.D. Ind. July 16, 2024) (similar). This certification requirement serves to bolster the specificity requirement; the attorney must put skin in the game and detail the efforts made to give notice or aver why he or she, personally, believes notice should not be required. But the boilerplate certifications that are endemic in Schedule A litigation raise significant questions as to whether attorneys are meeting their obligations under Rule 65 by seeking extraordinary relief without providing specifics as to why notice was not required for each defendant.

Of course, the concerns detailed above relate principally to whether the Schedule A mechanism is consistent with the text of Rule 65. There are, however, broader concerns about whether these commonplace efforts in Schedule A cases to

obtain secret relief comport with principles of procedural due process. A party faced at the outset with the specter of a secretly-imposed asset restraint starts the game backed up against their own end zone. This disadvantage can distort the parties' respective settlement positions and otherwise alter the balance of power to defendants' detriment. *See Sad Scheme* at 183 ("With substantial assistance from judges, rightsowners can use these dynamics to extract settlements from online merchants without satisfying basic procedural safeguards . . . ."). Schedule A plaintiffs may cite this coercive effect as a net benefit, given the ability of overseas defendants to hide assets, regroup under a different online moniker, and continue their nefarious dealings, but that is largely beside the point. Courts cannot permit a threshold presumption in favor of brand-owner plaintiffs any more than they could permit a presumption in favor of any other plaintiff. Pilfering intellectual property causes great harm, to be sure, but the remedy does not lie in stretching the civil rules past the breaking point. *C.f. Brewer v. Williams*, 430 U.S. 387, 406 (1977) ("[Z]eal for the public good does not assure either wisdom or right in the methods it pursues.").

In the same vein, the approach of Schedule A plaintiffs also raises questions about whether their primary aim is to stop infringement. Secrecy makes little sense if the goal of the litigation is to protect rightsholders' IP interests by obtaining an injunction against defendants' sales of infringing or counterfeit goods. Such a goal requires that defendants receive an order to stop. As Judge Seeger has explained, if rightsholders *actually* want the foreign sellers to "knock it off," a court order to that effect "won't do much good unless [d]efendants are told to stop counterfeiting[.]"

15

*Zorro*, 2023 WL 8807254, at *3. Indeed, such an order "requires publicity, not secrecy." *Id*. Put another way, the purported goal of seeking emergency injunctive relief to stop particular individuals or businesses from selling infringing products is incompatible with secret, one-sided proceedings.

There is, as discussed above, an inherent tension between the generalized Schedule A mechanism and Rule 65(b)'s demand for specificity. Schedule A plaintiffs have sought to create a mass-action mechanism by which one complaint stating a claim for relief is used to sue a mass of defendants. But the efficiency of Schedule A depends upon the complaint applying broadly to each defendant; otherwise, the plaintiff would have to file separate cases, precisely the scenario Schedule A plaintiffs appear to seek to avoid. Submitting a broadly-drafted complaint along with a demand for emergency ex parte relief against dozens, if not hundreds, of defendants creates an unworkable tension between efficiency and the specifics needed as to each defendant before injunctive relief can be imposed. Those requirements of specificity serve to protect nonmovants, the public, and the integrity of the judiciary; they must not be callously disregarded. As to Schedule A cases in general, and this case in particular, the Court is unsatisfied that the standard for ex parte relief has been met. That alone suffices to deny the present request for a TRO.

### 2. A Prejudgment, Ex Parte Asset Restraint is Unwarranted

Another facet of the Schedule A model is that plaintiffs routinely seek an ex parte prejudgment freeze of defendants' assets at the outset of the case. *See, e.g., The Counterfeit Sham* at 494 n.152. Because a district court "may not issue an injunction freezing assets in an action for money damages where no equitable interest is

claimed," *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) (citing *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999)), Schedule A plaintiffs typically justify their request for an asset restraint under the theory that assets must be preserved for a later equitable accounting of defendants' profits. But as Judge Seeger has examined at length, an equitable recovery, as a practical matter, "almost never" happens in Schedule A cases. *Zorro*, 2023 WL 8807254, at *4. Schedule A plaintiffs instead typically "rush into court, request and receive an asset freeze, and obtain a default judgment. And then, the Schedule A plaintiffs ask district courts to unfreeze the money and award statutory damages, not equitable relief." *Id.* Stated differently, Schedule A plaintiffs typically "receive a remedy at law, not a remedy in equity, which means that there was no justification for an asset freeze in the first place." *Id.*

This Court's experience has been similar, in that it has not seen a Schedule A trademark or copyright plaintiff seek an equitable monetary remedy at the end of the case (patent cases are the occasional and rare exception, given the lack of a statutory damages remedy). On the contrary, as to remaining defendants who have not settled or otherwise been dismissed, plaintiffs seek a default judgment that awards statutory money damages. Seeking an asset freeze at the outset thus appears to be an coercive goal in and of itself because, if obtained, the freeze immediately locks down defendants' assets, which combined with the ex parte TRO, causes "severe or fatal cash-flow problems for the defendant, which may not be able to pay its vendors, employees, or lawyers." *See Sad Scheme* at 191.

It is for precisely those reasons that prejudgment asset restraints ought to be the rare exception, not the norm that they have become in the Northern District of Illinois. Although the Court presumably could properly entertain a request for an asset freeze "for the limited purpose of allowing equitable relief down the road," *Zorro*, 2023 WL 8807254, at *4, an asset freeze that strangles defendants at the outset, thus rationally prompting them to settle involuntarily, is far from equitable and is inconsistent with *Grupo Mexicano*. And even if a prejudgment asset restraint could lawfully be granted under these circumstances, equitable relief such as an accounting is traditionally a discretionary remedy. *See Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 736 (7th Cir. 2004). In view of the practical realities outlined above, the Court will exercise its discretion to deny requests for a prejudgment, ex parte asset freeze in this and other Schedule A cases.

### B.    Plaintiff is Not Entitled to a TRO

A separate issue, beyond the matters analyzed above, is the substantive question whether Plaintiff is entitled to a TRO. Applying the relevant injunction factors and weighing the parties' relative interests at this pre-adversarial stage, the Court finds that a TRO is unwarranted.

#### 1.    *Injunction Factors: Likelihood of Success, Adequate Remedy at Law, and Irreparable Harm*

Schedule A TRO motions, in this case and others, should fail at the outset because it is all but impossible for the Court to discern the likelihood of success from the one-sided evidence provided. Plaintiffs in Schedule A cases regularly base their TRO requests (purportedly intended to stop defendants' counterfeiting or

infringement) on voluminous pages of screenshots from online marketplaces. *See*, *e.g.*, *The Counterfeit Sham* at 493–500; *Sad Scheme* at 193–94. It is nearly impossible to resolve whether defendants are engaged in counterfeiting on such a sparse record, without the actual products at issue,[7] absent adversarial briefing, and based solely on comparing hundreds of screenshots to plaintiffs' asserted intellectual property.

As for the other injunction factors, it is true that "the Seventh Circuit has 'clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy,' " and that as a result irreparable harm "is generally presumed in trademark infringement cases." *Milwaukee Elec. Tool Corp. v. Schedule "A"*, No. 24 C 12487, 2025 WL 1677503, at *4 (N.D. Ill. June 13, 2025) (quoting *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001)). To reiterate the concerns above, the generic facts alleged in Schedule A cases cannot satisfy Rule 65(b); by extension, Schedule A plaintiffs should not be entitled to such presumptions. For present purposes, however,

---

[7] It is particularly difficult to analyze on an ex parte basis whether defendants are likely to succeed on a showing of likelihood of confusion for trademark infringement, or that the alleged goods bear counterfeit marks. It is true that courts "can presume likelihood of confusion where a defendant 'produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product.' " *Ent. One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 949 (N.D. Ill. 2019) (quoting *Microsoft Corp. v. Rechanik*, 249 Fed. App'x. 476, 479 (7th Cir. 2007)). But plaintiffs in Schedule A cases do not produce the goods in question; rather, they typically attach a series of screenshots of the supposedly infringing or counterfeit goods. The ex parte production of screenshots is insufficient to obtain the benefit of this presumption; perhaps defendants will assert they have license to use the mark or marks in question, or perhaps a physical examination of the goods will reveal that they do not meet the strict definition of "counterfeit." In any event, to decide these issues on an ex parte basis without adversarial briefing asks too much.

it can be assumed that the irreparable harm and adequate remedy at law factors are met.

### 2. Balance of Interests

Even assuming that the likelihood of success, irreparable harm, and adequate remedy at law factors are met, the Court is not persuaded that the Schedule A mechanism satisfies the balance of interests inquiry—or even that the Court can properly weigh the interests at stake without Defendants' presence in the case. In this second stage of the injunction inquiry, the Court must "balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the public interest." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986) (cleaned up). Using a sliding scale approach, the test requires the court to weigh "the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief," and where appropriate consider the public interest. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

Starting with the private interests at stake, it is difficult to see how this balancing can be done reliably on the sparse and one-sided record present at the beginning of a typical Schedule A case. Schedule A complaints are, to repeat, drafted at a high level of generality; it is impossible to know the irreparable harm the moving party faces vis-à-vis any particular defendant. More to the point, without appearances from defendants in the case, courts have no reliable way to assess how

the proposed injunctive relief will harm the nonmoving parties. That fact renders balancing the private interests impossible.

Separately, there is significant doubt that the Schedule A mechanism serves the public interest. To satisfy interest balancing, the "injunction must do more good than harm (which is to say that the 'balance of equities' favors the plaintiff)." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009); *see also* M Devon Moore, *The Preliminary Injunction Standard: Understanding the Public Interest Factor*, 117 Mich. L. Rev. 939, 949 (2019) ("A plaintiff required to prove that an injunction furthers the public interest faces a high burden . . . .").

Schedule A cases may be more likely to harm the public interest than to favor it. As Professor Goldman notes in *Sad Scheme*, the Schedule A mechanism works to "create an environment in which rightsowners can nominally follow the rules and yet achieve abusive and extortive outcomes." *Sad Scheme* at 197. When courts bless generic ex parte pleadings with sealed emergency injunctions and asset restraints for (potentially) hundreds of defendants at once, defendants learn about the lawsuit against them only when their marketplace accounts are frozen. *Id.* at 191. That leaves defendants' businesses and cash flow "in tatters." *Id.* Schedule A plaintiffs then "offer a convenient resolution—settle at a price reflecting the merchant's dire need for an immediate solution," and if the defendant accepts, the Schedule A plaintiffs dismiss the defendant from the case. *Id.* at 191–92.

21

This landscape harms the public in several ways. To begin, it forces settlements where defendants might otherwise prefer to litigate the case but cannot do so because their assets and business are locked up by an injunction. Defendants in Schedule A cases therefore tend to "settle involuntarily—without the court hearing their story at all—because it's cheaper, quicker, or more predictable compared to fighting back." *Id.* at 192. Prompting unwarranted settlements is a "systemic process failure, not the prosocial outcomes normally associated with settlements." *Id.*

A broader concern from the public's standpoint ought to be the routine granting—in cookie-cutter fashion, multiple times per day, for years on end—of ex parte injunctive relief. To restate the law: a TRO is "an extraordinary and drastic remedy," *Goodman*, 430 F.3d at 437, and one that "should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 165 (2010). A single federal judicial district granting hundreds or thousands of requests per year for ex parte, "extraordinary" TROs should by itself give the Judiciary serious pause on the public's behalf. This alone may be, indeed is, an independent and sufficient reason to deny a TRO in this and other Schedule A cases.

## C. Joinder

A final point: the Court echoes concerns raised elsewhere in this District about the propriety of joining multiple defendants in Schedule A cases. *See Estee Lauder Cosms. Ltd. v. Partnerships & Unincorporated Associations Identified on Schedule A*, 334 F.R.D. 182, 187–90 (N.D. Ill. 2020) (Chang, J.) ("[I]t is not enough for a plaintiff to simply allege that multiple defendants have infringed the same patent or trademark to meet Rule 20's requirements."); *Bailie v. Partnerships &*

*Unincorporated Associations Identified on Schedule A*, 734 F. Supp. 3d 798, 802–04 (N.D. Ill. 2024) (Gottschall, J.) (conclusory allegations without specific facts are not sufficient to satisfy Rule 20(a)(2)'s requirements for joinder). Accordingly, should Plaintiff wish to maintain this action, the Court will likely require expedited briefing as to the propriety of joinder.

*     *     *

As currently entrenched, the Schedule A mechanism demands that the Federal Rules of Civil Procedure and principles of due process be unreasonably contorted for plaintiffs to receive the relief they seek. It is no answer to say that the ends justify the means—that the scourge of rampant counterfeiting justifies the present scheme. That excuse has been rejected in other areas of the law, and it should be rejected here too.

At the same time, it must also be acknowledged that the costs of counterfeiting and IP theft are real, are significant, and are very difficult to combat legally with the tools presently at plaintiffs' disposal. That the Schedule A mechanism is a bridge too far does not mean that a remedy cannot be found, or created legislatively, elsewhere. In the meantime, however, the Schedule A mechanism should no longer be perpetuated in its present form.

## IV.    CONCLUSION

Plaintiff's motion for a temporary restraining order (Dkt. 11) is denied.[8]

SO ORDERED in No. 25-cv-02937.

Date: August 8, 2025

_____
JOHN F. KNESS
United States District Judge

---

[8] It is this Court's respectful view that guidance from the Court of Appeals concerning the propriety of the Schedule A mechanism would greatly aid the Judges of the Northern District of Illinois in adjudicating Schedule A cases. After all, the content of this opinion could be misguided—or just plain wrong. To that end, the Court would entertain a motion by Plaintiff to certify this decision for an interlocutory appeal.